CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JAN 2 2018

JULIA C. DUDLEY, CLERK
BY:  s/ MARTHA L. HUPP
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| FELICIA FAYE THROCKMORTON, | ) | |
| Plaintiff, | ) | Civil Action No. 4:16-cv-00047 |
| | ) | |
| v. | ) | |
| | ) | REPORT & RECOMMENDATION |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | By:    Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Felicia Faye Throckmorton asks this Court to review the Acting Commissioner

of Social Security's ("Commissioner") final decision denying her applications for disability

insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of

the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me

by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 12. Having considered the administrative

record, the parties' briefs, and the applicable law, I find that the decision is not supported by

substantial evidence. Accordingly, I recommend that the decision be reversed and the case be

remanded under the fourth sentence of 42 U.S.C. § 405(g) to give the Commissioner another

opportunity to explain her findings and conclusions.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's

regulations; (4) can return to his or her past relevant work based on his or her residual functional

capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461

U.S. 458, 460–62 (1983); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The applicant bears the

burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden

shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

This case involves Throckmorton's fourth attempt since March 2003 to obtain disability

benefits. *See* Administrative Record ("R.") 10, ECF No. 9-1. Throckmorton filed the underlying

applications on August 27, 2012, alleging that she is disabled because of anxiety attacks and

depression, migraine headaches, emphysema, bilateral carpal tunnel syndrome, two herniated

discs in her back, and toxoplasmosis. R. 78, 88. She says that she has been disabled since May

18, 2012, which is one day after ALJ Charles Boyer issued a written decision denying her third

application for benefits. R. 10, 63–73, 78, 88. The Commissioner rejected Throckmorton's

current claims initially in November 2012 and on reconsideration in August 2013. R. 98–99,

134–35. On February 5, 2015, Throckmorton appeared with counsel for an administrative

hearing before ALJ Brian Kilbane. R. 39–58. Throckmorton and a vocational expert ("VE") both

testified at the hearing. R. 42–53, 53–57.

ALJ Kilbane issued an unfavorable decision on February 20, 2015. R. 10–31. He first

found that Throckmorton had not worked since May 18, 2012, and that she met the Act's insured

status requirements through June 30, 2014.[1] R. 13. At step two, ALJ Kilbane found that

Throckmorton had "the following severe impairments: degenerative disc disease, degenerative

---

[1] To qualify for DIB, Throckmorton "must prove that she became disabled prior to the expiration of her insured status." *Johnson*, 434 F.3d at 656; *see* 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. § 404.131 (2014). Throckmorton's date last insured is not relevant to her claim for SSI. *See Redditt v. Colvin*, No. 7:13cv391, 2014 WL 2800820, at *4 n.3 (W.D. Va. June 18, 2014); 20 C.F.R. §§ 416.202, 416.501 (2014).

joint disease, asthma, chronic obstructive pulmonary disease . . . , major depressive disorder[,] and panic disorder without agoraphobia."[2] *Id.* None of these impairments, alone or combined, met or medically equaled one of the presumptively disabling impairments listed in the Act's regulations. R. 13–16. As part of his step-three analysis, the ALJ also found that Throckmorton had "mild" limitations performing daily activities, "moderate difficulties" in social functioning, and "moderate difficulties" maintaining concentration, persistence, or pace. R. 15.

The ALJ next evaluated Throckmorton's residual functional capacity ("RFC") based on all of her medical impairments.[3] R. 16–25. He determined that Throckmorton could perform "light work"[4] that never involved climbing ladders, ropes, or scaffolding; involved at most frequent kneeling, and occasional balancing, stooping, crouching, and climbing ramps/stairs; and avoided concentrated exposure to fumes, odors, dust, gases, and poor ventilation. R. 16. He also found that Throckmorton retained the mental capacity "to perform simple, unskilled work on a sustained basis in a competitive work environment with no more than occasional interaction with coworkers in the [sic] general public." *Id.* This RFC ruled out Throckmorton's return to all of her past relevant work. R. 25. Finally, based on this RFC finding and the VE's testimony, the ALJ concluded that Throckmorton was not disabled after May 18, 2012, because she still could perform several widely available "light unskilled" occupations, such as packer, inspector/grader,

---

[2] ALJ Kilbane also found that all of Throckmorton's other medical conditions, including carpal tunnel syndrome and migraine headaches, were non-severe impairments. R. 13. Throckmorton does not challenge this finding on appeal. *See generally* Pl.'s Br. 1–15, ECF No. 16.

[3] A claimant's RFC represents her "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis" despite her medical impairments. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted); *see* 20 C.F.R. §§ 404.1545, 416.945.

[4] "Light work" involves lifting no more than twenty pounds at a time but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting requirements can perform light work only if he or she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990).

and assembler. R. 26–27. The Appeals Council denied Throckmorton's request for review, R. 1–

3, and this appeal followed.

III. Discussion

Throckmorton's brief contains several arguments that either challenge specific aspects of

ALJ Kilbane's RFC determination, *see* Pl.'s Br. 4–7, 11, or more broadly object to his evaluation

of the medical and other relevant evidence in the record, *see id.* at 8–11, 12–15. Her main

objection to the RFC determination—and by extension ALJ Kilbane's reliance on the VE's

testimony in response to a hypothetical question propounding the same RFC—is that the ALJ did

not explain how the restriction to "simple, unskilled work" accommodated his step-three finding

that Throckmorton had "moderate difficulties" maintaining concentration, persistence, or pace.[5]

*See* Pl.'s Br. 4–5 (citing *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015)). Throckmorton also

objects that ALJ Kilbane's mental RFC assessment is flawed because he appears to have

assigned different weights to two facially consistent medical opinions concerning her limited

---

[5] Throckmorton also objects that the ALJ's physical RFC assessment for light work with additional
postural restrictions is flawed because, although the record contains ample evidence that Throckmorton
"almost always walks with a cane," the ALJ did not make any specific findings about whether she
actually needs to use a cane. *See* Pl.'s Br. 11. Social Security Ruling ("SSR") 96-9p requires the ALJ to
consider "the impact of 'medically required' hand-held devices," such as a cane, when evaluating the
individual's RFC. *Wimbush v. Astrue*, No. 4:10cv36, 2011 WL 1743153, at *2–3 (W.D. Va. May 6, 2011)
(quoting SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996)). Although Throckmorton's medical records
show that she usually walked with an abnormal gait and sometimes used a cane for support, *see, e.g.*, R.
380, 383, 387, 395, 398, 401, 415, 494, Throckmorton does not point to any specific piece of evidence
not considered by the ALJ, *see Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014), indicating
that the cane was "medically required," SSR 96-9p, 1996 WL 374185, at *7 ("To find that a hand-held
assistive device is medically required, there must be medical documentation establishing the need for a
hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is
needed . . . ."); *see also Fletcher v. Colvin*, No. 1:14cv380, 2015 WL 4506699, at *8 (M.D.N.C. July 23,
2015) ("[A] prescription or the lack of a prescription for an assistive device is not necessarily dispositive
of medical necessity." (citing *Staples v. Astrue*, 329 F. App'x 189, 191–92 (10th Cir. 2009))). Nor does
she develop any meaningful argument about why the ALJ's failure to make specific findings as to
whether Throckmorton "needs a cane," without more, warrants reversal and remand on this particular
issue. Pl.'s Br. 11; *cf. Timmons v. Colvin*, No. 3:12cv609, 2013 WL 4775131, at *9 (W.D.N.C. Sept. 5,
2013) ("Because there is no evidence showing that the cane is medically required or law requiring an ALJ
to consider the impact of a non-required device, the ALJ did not err in finding the Plaintiff could perform
light work.").

ability to pay attention to and perform even simple, repetitive tasks on a consistent or sustained basis. *See id.* at 5–7. The Commissioner urges the court to reject these arguments "because the evidence failed to establish additional restrictions based on [Throckmorton's] moderate deficiencies in concentration, persistence, or pace, and [she] has not shown otherwise in her brief." Def.'s Br. 6 (citing *Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014)), ECF No. 18. Throckmorton has the better position in this case. "Given the depth and ambivalence of the [current] record," however, I find that the court should remand the case to give the Commissioner another opportunity to adequately explain her findings and conclusions. *See Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013). Accordingly, I will limit my discussion of the evidence relevant to Throckmorton's difficulty maintaining concentration, persistence, or pace, and I will not address her broader objections to the ALJ's evaluation of the record as a whole. Pl.'s Br. 8–10, 11–15.

A.      *The Legal Framework*

A claimant's RFC represents her "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis"[6] despite her medical impairments. SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted); *see* 20 C.F.R. §§ 404.1545, 416.945. It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined functionally limiting effects of impairments that are supported by the medical evidence or the claimant's credible symptoms, *see Mascio*, 780 F.3d at 640. The ALJ's RFC assessment must also "include a narrative discussion describing"

---

[6] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2. "[T]he RFC assessment must include a discussion of the individual's abilities on th[is] basis." *Id.*; *accord Mascio*, 780 F.3d at 637 ("[A]lthough the ALJ concluded that Mascio can perform certain functions, he said nothing about Mascio's ability to perform them for a full workday.").

how medical facts and nonmedical evidence "support[] each conclusion," *Mascio*, 780 F.3d at

636, and explaining why he discounted any "obviously probative" contradictory evidence,

*Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977); *see also Reid*,

769 F.3d at 865. As part of this discussion, the ALJ must "build an accurate and logical bridge

from the evidence to his conclusion," *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)

(quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)), that the claimant retains a certain

ability to sustain work-related activities, *Mascio*, 780 F.3d at 636–37. Meaningful judicial review

rarely is possible when the court is "left to guess about how the ALJ" reached that conclusion.

*Mascio*, 780 F.3d at 638; *see also Bradley v. Berryhill*, No. 4:16cv26, 2017 WL 4707035, at *2–

4 (W.D. Va. Oct. 19, 2017).

B.      *Relevant Evidence*

        Throckmorton's medical records from the relevant time show that she had been

diagnosed with chronic anxiety and depression and had been prescribed several medications

(e.g., Celexa, Cymbalta, Lexapro, Paxil, Xanax, Zoloft) for those conditions. *See generally* R.

379–413, 431–502. Throckmorton's primary care provider, Johanna Thomas, M.D., typically

managed these medications. Throckmorton went to Dr. Thomas's clinic for routine follow-up

appointments about once a month between July 2012 and January 2015. *See id*. On most visits,

providers observed that Throckmorton was alert, oriented, cooperative, and exhibited normal

memory function. R. 380, 383, 386, 395, 398, 401, 404, 410, 454, 457, 460, 469, 482, 488, 492.

They very rarely observed that Throckmorton exhibited a "flat affect," R. 432, or appeared "sad"

and "depressed," R. 436, 440. Treatment notes reflect that Throckmorton's chronic anxiety

and/or depressive disorder often fluctuated between "controlled" and "not controlled" throughout

the relevant period. R. 380, 395, 407, 432, 437, 447, 450, 454, 466, 473, 479, 482, 495, 501. Dr.

Thomas or her colleagues occasionally increased or changed Throckmorton's medications. R. 392–93, 398, 406–07, 431–33, 455, 460, 465–67, 483–84, 494–96. On three occasions, Throckmorton told providers that she could not get certain prescriptions, or pursue mental-health counseling, because she did not have health insurance and could not afford to pay out of pocket. R. 449–50 (Aug. 2014), 446 (Sept. 2014), 432 (Jan. 2015).

On August 13, 2013, Throckmorton had a consultative psychological examination with Christopher Cousins, Ph.D. R. 415–23. She reported "one prior in-patient psychiatric hospitalization" for a week or two "sometime in her 20s," but she could not recall exactly why she was hospitalized. R. 418–19. Throckmorton said that she had attended outpatient counseling in the past, but she could not produce any psychiatric records for Dr. Cousins to review. R. 419. Dr. Cousins noted that the available medical records "indicate[d] a history of anxiety and depression," and that Throckmorton was currently taking Xanax and Cymbalta for those conditions. *Id.* Throckmorton reported feeling sad "all the time" and said there is "no activity she enjoys doing or likes to do." R. 420. She spent most days lying on the couch watching television. R. 419. Throckmorton said that she could prepare her own "microwave meals, cereal, and snacks," but that her father and a friend handled the shopping. R. 420. If she did go shopping, she would only go out on Friday night to avoid the crowds of people that triggered her "frequent" panic attacks. R. 422. Throckmorton also noted that chronic physical pain prevented her from performing "instrumental activities of daily living," such as doing laundry and cleaning her home. R. 421.

Dr. Cousins observed that Throckmorton was cooperative and answered his questions without "evidence of suspiciousness, hostility, or evasiveness," but that her affect and mood were "restricted" and "depressed," and that she "became tearful on a few occasions during the

evaluation." R. 415–16. On examination, he noted that Throckmorton was "oriented to person, time, and place," R. 421, and "was able to articulate an understanding of the purpose of the evaluation," R. 416. Her memory function seemed to be a mixed bag: her recent memory appeared "to be good," while her remote memory appeared "to be fair-to-good" and her immediate memory appeared "to be fair at best." R. 421. Throckmorton's abstract thinking ability, judgment, and common-sense reasoning ability all "appear[ed] to be fair." *Id.* Her thought content and processes remained "logical, coherent, and organized" throughout the evaluation. R. 420. "However, [she] would sometimes be tangential with her responses," which required Dr. Cousins "to redirect her to the question asked." R. 416. Throckmorton's eye-contact was "broken" and she exhibited "[s]ome psychomotor retardation" during the evaluation. *Id.*

Dr. Cousins diagnosed Throckmorton with major depressive disorder, recurrent, moderate-to-severe without psychotic features and panic disorder without agoraphobia. R. 422. He opined that, "[b]ased on her performance on the mental status evaluation," Throckmorton appeared capable of performing "simple and repetitive tasks," but "would not be able to perform detailed and complex tasks." *Id.* Dr. Cousins did not see anything in Throckmorton's intellectual functioning to suggest she would need special instructions or additional supervision on the job. *Id.* "Due to her depression and anxiety symptoms," however, she "would likely have difficulty maintaining regular attendance in the workplace, performing work activities on a consistent basis, and completing a normal work day or work week without interruption." *Id.* Dr. Cousins opined that Throckmorton "appear[ed] capable of accepting instructions from a supervisor," but that her panic attacks would likely cause "difficulty" when interacting with coworkers and the public. R. 423. He also said she "would have difficulty coping with the typical stresses encountered in competitive work." *Id.*

9

On August 29, 2013, Andrew Bockner, M.D., reviewed Throckmorton's records submitted to the state agency through that date. R. 117–32. He opined that her diagnosed panic disorder without agoraphobia and major depressive disorder were "severe" medically determinable impairments that caused "moderate" difficulties in social functioning, "moderate" difficulties maintaining concentration, persistence, or pace, and "mild" limitations in activities of daily living.[7] R. 108, 125. Dr. Bockner also completed an RFC assessment offering his opinions about how Throckmorton's limitations in these three broad categories would affect her ability to perform or sustain specific mental activities in a competitive workplace. R. 111–14, 128–30. For example, he opined that Throckmorton was "not significantly limited" in her abilities to understand, remember, and execute "very short and simple instructions"; "make simple work-related decisions"; "sustain an ordinary routine without special supervision"; or "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." R. 111–12, 128–30.

But Dr. Bockner also opined that Throckmorton was "moderately limited" in many other work-related areas, including her ability to: "maintain attention and concentration for extended periods"; "work in coordination with or in proximity to others without being distracted by them"; "interact appropriately with the general public"; "get along with coworkers or peers without distracting them or exhibiting behavioral extremes"; "respond appropriately to changes in the work setting"; and "complete a normal workday and workweek without interruptions from

---

[7] Richard Luck, Ph.D., initially reviewed Throckmorton's records submitted to the state agency through November 29, 2012. R. 78–97. Dr. Luck opined that Throckmorton's anxiety-related disorder and affective disorder were "non-severe" medically determinable impairments because they caused at most "mild" difficulties in social functioning, "mild" difficulties maintaining concentration, persistence, or pace, and "mild" restrictions in her activities of daily living. R. 82–83, 92–93. As support for his opinion, Dr. Luck cited an agency employee's contemporaneous note indicating that Throckmorton continued to treat her depression with medication and was not currently in outpatient treatment. R. 81, 91. He also noted that Throckmorton's reported daily activities, such as performing light chores and running errands if needed, were "not indicative of a severe mental health impairment." R. 82, 92.

psychologically based symptoms and to perform at a consistent pace without an unreasonable
number and length of rest periods." R. 111–13, 129–30. Like Dr. Cousins, Dr. Bockner attributed
these limitations to Throckmorton's performance on her mental status evaluation, as well as to
her history of depression, anxiety, and reported panic attacks. R. 111–13, 128–30; *see also* R.
109–10, 113, 126, 130 (Dr. Bockner noting that the specific limitations Dr. Cousins identified
were "generally consistent w[ith] the other evidence" and were not "more restrictive" than Dr.
Bockner's own findings). Ultimately, Dr. Bockner concluded that Throckmorton could "perform
competitive work doing simple repetitive tasks" as long as she had at most "limited contact with
the general public." R. 113, 130; *see also* R. 112–13, 129–30 (Dr. Bockner stating that
Throckmorton "can do SRW that is not in a public venue" and "cannot work in public"). He did
not explicitly indicate whether Throckmorton's "moderately limited" abilities "to maintain
attention and concentration for extended periods" and "to perform at a consistent pace without an
unreasonable number and length of rest periods" would nonetheless allow her to perform "simple
repetitive tasks" on a sustained basis. *See* R. 112–13, 129–30.

Throckmorton filled out an Adult Function Report in October 2012, and again in May
2013. R. 268–75, 310–17. She reported that she could dress herself, microwave frozen meals,
and feed her dog, but that chronic physical pain, emphysema, anxiety, and depression prevented
her from performing most other activities of daily living. *See* R. 269–75, 310–16. She usually did
two loads of laundry per month and could do "a little" cleaning around her mobile home on the
days her friends did not stop by to help. *See* R. 269–71. Throckmorton left her house only when
necessary to go to doctors' appointments and the grocery store and pharmacy, usually two or
three times per month. *See* R. 271–72, 313, 314. She used to enjoy reading books, but now
struggled to stay focused and remember what she read. R. 272. In October 2012, Throckmorton

estimated that she could concentrate on "someone talking or [the] TV" for fifteen minutes and

said that she could follow written instructions only if she read them "many times." R. 273. By

May 2013, Throckmorton estimated that she could pay attention for five minutes before her

"mind is wandering" and she could follow directions only "if explained a few times" because she

was "very forgetful." R. 315. Throckmorton also wrote notes to remind herself to shower

regularly and to take her medications every day. R. 270, 312.

At the administrative hearing in February 2015, Throckmorton testified that she felt

depressed all the time and that her doctor recently told her to stop taking Xanax for her anxiety

attacks because the drug should not be combined with one of her pain medications. R. 47, 48; *see*

R. 460. She spent most of her time watching television and still struggled to concentrate or pay

attention for extended periods. R. 51. Throckmorton did not do any laundry or yard work, and

her father would come to her house "two [or] three dozen times a day" to "do whatever needed to

be done." R. 51–52.

*C.     ALJ Kilbane's Decision*

ALJ Kilbane discussed Throckmorton's mental impairments throughout his written

decision. At step two, he found that Throckmorton's major depressive disorder and panic

disorder without agoraphobia were "severe" medically determinable impairments because they

caused "more than minimal limitations" in her ability to perform basic mental work activities. R.

13; *see* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2014). At step three, ALJ Kilbane found that

Throckmorton had "mild" limitations performing daily activities, "moderate difficulties" with

social functioning, and "moderate difficulties" maintaining concentration, persistence, or pace.

R. 15. He explained his finding as to Throckmorton's difficulties maintaining concentration,

persistence, or pace by noting that her own statements to the agency

> show she reports difficulties with paying attention, concentrating, completing
> tasks, and problems with her memory. When following instructions she
> sometimes has to reread or have them repeated. [Throckmorton] alleged difficulty
> handling stress or changes in her routine. She reported that during the day she
> watched television and read. She is able to prepare simple meals, care for her pet,
> complete some household chores, and is able to handle her finances.

R. 15 (citing R. 268–75, 310–17). Elsewhere in his decision, the ALJ explained that

Throckmorton's statements describing her psychological symptoms were "not entirely credible,"

R. 17, because she had "not sought outpatient mental health treatment and ha[d] no history of

psychiatric hospitalizations"; her primary-care provider prescribed medication for anxiety and

depression; her anxiety and depressive disorder were noted to be "controlled" on several

occasions throughout the relevant period; she "never sought emergency room or urgent care

treatment for exacerbation of symptoms"; her mental-status "examination findings were mostly

normal and she never appeared in distress"; and, although her "activities of daily living may be

slightly limited," they were "not indicative of [a] disabling mental health impairment," *see* R. 21.

    ALJ Kilbane also summarized the medical-source evidence of Throckmorton's mental

impairments and related functional limitations in assessing her RFC. *See* R. 19–21, 24–25. His

written decision included a fairly thorough and mostly accurate discussion of Dr. Thomas's

clinic notes, Dr. Cousins's opinions and report from the consultative evaluation, and Dr.

Bockner's subsequent opinions and mental RFC assessment. *See* R. 19–21, 24–25. For example,

the ALJ's discussion of Dr. Thomas's progress notes tended to highlight the visits where

Throckmorton's chronic anxiety and/or depressive disorder were noted to be "controlled" on her

current medications, *see* R. 20–21 (citing R. 395, 437, 479, 501), without explicitly

acknowledging there were many times throughout the relevant period when providers considered

those conditions "not controlled" by medications, *see, e.g.*, R. 380, 407, 432, 447, 450, 454, 482,

495. Similarly, the ALJ limited his discussion of Throckmorton's performance on the August

13

2013 mental-status exam to Dr. Cousins's findings that "she was alert and oriented, and had fair immediate memory," R. 20, without acknowledging Dr. Cousins's abnormal findings, such as that Throckmorton exhibited "[s]ome psychomotor retardation" and gave "tangential" responses, which required Dr. Cousins "to redirect her to the question asked," R. 420.

ALJ Kilbane explained that Dr. Cousins had opined that Throckmorton "appeared capable of performing simple and repetitive tasks without special instructions or additional supervision," but that "she would likely have difficulty" maintaining regular attendance in the workplace, performing activities on a consistent basis, completing a normal workday or workweek without interruption, coping with the typical stresses encountered in competitive work, and interacting with coworkers and the public. R. 25. He gave Dr. Cousins's opinion "little weight" because it seemed to be an "overestimate of [Throckmorton's] limitations, based only on a snapshot of her functioning." *Id.* The ALJ also found that Dr. Cousins's opinion was "inconsistent with" Throckmorton's "conservative treatment history" and her reported daily activities. *Id.*

ALJ Kilbane noted that Dr. Luck, the state-agency psychologist who initially reviewed Throckmorton's records available in November 2012, opined that her anxiety and depression were non-severe impairments because they caused "only mild" restrictions in her activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace. R. 24; *see* R. 78–87, 88–97 (Exs. B2A, B3A). He also explained that in August 2013, Dr. Bockner opined that Throckmorton's severe "mental health impairments (major depressive disorder and panic disorder without agoraphobia) caused mild restriction" in her activities of daily living, "moderate difficulties" in social functioning, and "moderate difficulties in maintaining concentration, persistence, or pace," but that she was "capable of performing competitive work

14

doing simple, repetitive tasks with limited contact with the general public." R. 24; *see* R. 100–16, 117–32 (Exs. B6A, B7A). ALJ Kilbane did not mention Dr. Bockner's more detailed opinions that Throckmorton was "moderately limited" in her ability to perform or sustain specific mental activities—including those related to concentration, persistence, and pace—in a competitive workplace. R. 24; *see* R. 112–13, 129–30.

ALJ Kilbane then assigned a collective weight to all of the state-agency reviewers' medical opinions: "The opinions of the State Agency assessments are given partial weight, particularly the assessment at Exhibits B6A and B7A in their finding of severe mental impairment." R. 25. He explained that "[t]heir opinions [were] generally consistent with [Throckmorton's] history of conservative treatment and limited clinical findings during the period at issue" and were further "consistent with" her reported daily activities from the same time. *Id.* (citing R. 268–75). ALJ Kilbane also noted that his RFC determination included environmental restrictions to accommodate Throckmorton's severe respiratory impairments, R. 24, which were not identified in any of the state-agency reviewers' opinions. Ultimately, ALJ Kilbane found that, "[d]espite her mental impairments," Throckmorton retained "the ability to perform simple, unskilled work on a sustained basis in a competitive work environment with no more than occasional interaction with coworkers in the [sic] general public." R. 16.

D.    *Analysis*

Throckmorton's objection to the ALJ's findings as to concentration, persistence, or pace invokes the Fourth Circuit's decision in *Mascio*, which, among other things, clarified the ALJ's duty to explain how a finding at step three that a claimant's "moderate limitation in concentration, persistence, or pace" either does or "does not translate into a limitation in [the claimant's] residual functional capacity." 780 F.3d at 638. In that case, the ALJ found that

Mascio had "moderate" limitations maintaining concentration, persistence, or pace, but his subsequent RFC determination merely limited her to "unskilled work." *Id.* And, although the ALJ's hypothetical question to the VE "said nothing about Mascio's mental limitations," he ultimately relied on the VE's testimony identifying certain "unskilled, light work jobs" in concluding at step five that Mascio was not disabled. *Id.* at 637–38 ("The ALJ's hypothetical, together with the [VE's] unsolicited addition of 'unskilled work,' matched the ALJ's finding regarding Mascio's residual functional capacity."). The Fourth Circuit reversed the Commissioner's decision and remanded the case for the ALJ to explain why Mascio's "moderate" limitations maintaining concentration, persistence, or pace did not translate into a limitation in her RFC—i.e., her maximum remaining *ability to sustain* work-related activities on a regular and continuing basis. *See id.* In doing so, the panel explained "that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the [RFC and] hypothetical question to simple, routine tasks or unskilled work,'" because "the ability to perform simple tasks differs from the ability to stay on task."[8] *Id.* at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). "Only the latter limitation [will] account for a claimant's limitation in concentration, persistence, or pace." *Id.*

Much like in *Mascio*, the ALJ in this case found at step three that Throckmorton had "moderate difficulties" maintaining concentration, persistence, or pace, but in assessing her RFC, he found that she retained "the ability to perform simple, unskilled work on a sustained basis in a competitive work environment with no more than occasional interaction with coworkers in the

---

[8] "'Unskilled work' is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher v. Barnhart*, 181 F. App'x 359, 364 n.3 (4th Cir. 2006) (quoting 20 C.F.R. § 404.1568(a) (2005)). The term itself says little, if anything, about a person's mental ability to concentrate on or persist in such duties or to maintain the pace required to complete tasks in a competitive work environment on a sustained basis. *See Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008); *Sexton v. Colvin*, 21 F. Supp. 3d 639, 642–43 (W.D. Va. 2014).

[sic] general public." R. 15, 16. He then relied on the VE's response to a hypothetical question propounding the same RFC in concluding at step five that Throckmorton was not disabled because she could perform certain "unskilled" light occupations. R. 26; *see* R. 54. But ALJ Kilbane never explained *why* he concluded that Throckmorton could perform "simple, unskilled work on a sustained basis in a competitive work environment," R. 16, even though she had "moderate difficulties" maintaining concentration, persistence or pace, R. 15. As in *Mascio*, that omission warrants reversal and remand for further explanation. 780 F.3d at 637–38.

The Commissioner responds that the ALJ's mental RFC determination is supported by substantial evidence because, although both Dr. Cousins and Dr. Bockner said Throckmorton "had difficulty staying on task" and had "moderate limitation[s] in [her] ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," the ALJ correctly noted that "Dr. Bockner ultimately opined that [Throckmorton] could perform simple, repetitive tasks with limited contact with the general public." Def.'s Br. 6. She also notes that the ALJ explained he gave Dr. Cousins's opinion little weight because he found it to be inconsistent with Throckmorton's "conservative treatment history" and reported daily activities. *See id.* at 6–7. As the Fourth Circuit has stated, there will be cases where a restriction to "simple, unskilled work" reasonably accommodates a claimant's "moderate" difficulties or limitations maintaining concentration, persistence, or pace—especially where there is credible medical evidence that the claimant can "show *sustained attention* to perform simple repetitive tasks" or is "mentally capable of independently performing basic, routine tasks *on a sustained basis*." *Sizemore v. Berryhill*, --- F.3d ---, 2017 WL 6374237, at *6 (4th Cir. Dec. 1, 2017) (rejecting a *Mascio*-type challenge where the ALJ cited such evidence in "finding that, despite Sizemore's

17

overall moderate difficulties with concentration, persistence, or pace, he would nonetheless be able to *stay on task* while performing 'simple one, two-step tasks,' as long as he was 'working in low stress non-production jobs with no public contact'"). But in such a circumstance, the ALJ must explain, citing relevant evidence from the record, how limiting the claimant to simple, unskilled work adequately accounts for her actual mental impairments. *See Mascio*, 780 F.3d at 637–38; *cf. Claiborne v. Comm'r*, No. SAG-14-1918, 2015 WL 2062184, at *4 (D. Md. May 1, 2015) (stating that the ALJ's findings at step three should represent a well-reasoned consideration of the evidence and "are not simply an opportunity to give the claimant the benefit of the doubt at one step while taking it away at the next step"). Here, ALJ Kilbane *concluded* that Throckmorton could do "simple, unskilled work *on a sustained basis* in a competitive work environment," R. 16 (emphasis added), but he did not cite or otherwise describe the evidence that he believed supported this particular conclusion, *Mascio*, 780 F.3d at 636–37. *Cf. Monroe*, 826 F.3d at 189 (explaining that it is not enough for the ALJ to "cite[] evidence that he appeared to believe tended to discredit" the claimant's testimony if he still "failed to 'build an accurate and logical bridge from the evidence to his conclusion' that [her] testimony was not credible" (quoting *Clifford*, 227 F.3d at 872)).

ALJ Kilbane compounded this error when weighing Dr. Cousins's and Dr. Bockner's medical opinions. *See* Pl.'s Br. 5–7 & n. 2. An ALJ must explain the weight given to all medical opinions, *Radford*, 734 F.3d at 295–96, and his "decision 'must be sufficiently specific to make clear to any subsequent reviewers the weight [he] gave' to the opinion and 'the reasons for that weight,'" *Harder v. Comm'r of Soc. Sec.*, No. 6:12cv69, 2014 WL 534020, at *4 (W.D. Va. Feb. 10, 2014) (quoting SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996)). ALJ Kilbane's written

decision does not meet this minimum standard, and there are two reasons why that deficiency requires reversal and warrants remand for further explanation.

First, Dr. Bockner's ultimate opinion, *see* Def.'s Br. 6, that Throckmorton "would be able to perform competitive work doing simple repetitive tasks with limited contact with the general public," R. 113, 130, is generally consistent with Dr. Cousins's opinion that Throckmorton "appears capable of performing simple and repetitive tasks," but "would likely have difficulty interacting with co-workers and the public," R. 423. *See also* R. 113, 130 (Dr. Bockner noting that Dr. Cousins's opinions were not "more restrictive" than his own findings). Both doctors said their opinions were based on Dr. Cousins's findings and observations during Throckmorton's August 2013 consultative psychological examination. *See* R. 126, 128–30, 422. The ALJ gave "little weight" to Dr. Cousins's opinion because it seemed "to be an overestimate of the severity of [Throckmorton's] limitations, based only on a snapshot of her functioning," and was "inconsistent with" her "conservative treatment history" and reported daily activities. R. 25. Yet, the ALJ also appeared to credit Dr. Bockner's opinion identifying the same limitations because he found that opinion to be "consistent with" Throckmorton's daily activities, conservative treatment, and the "limited clinical findings during the period at issue." R. 24; *see* R. 16, 25. He did not explain or otherwise attempt to clarify this discrepancy.

Second, ALJ Kilbane did not mention Dr. Bockner's specific opinions that Throckmorton was "moderately limited" in her abilities "to maintain attention and concentration for extended periods" and "to perform at a consistent pace without an unreasonable number and length of rest periods."[9] R. 24; *see* R. 112–13, 129–30. Even assuming he "considered" those limitations, *see*

---

[9] Unlike the reviewing physician in *Sizemore*, Dr. Bockner did not say that Throckmorton's "moderately limited" ability to perform at consistent pace without an unreasonable number and length of rest periods would still allow her to perform "simple repetitive tasks" *on a sustained basis. Compare* R. 112, 129, *with Sizemore*, 2017 WL 6374237, at *6.

*Reid*, 769 F.3d at 865, the "ALJ may not select and discuss only th[e] evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning," *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). Here, it is not clear whether ALJ Kilbane rejected Dr. Bockner's more specific findings and restrictions while crediting his ultimate conclusion that Throckmorton could "perform competitive work doing simple repetitive tasks," or whether ALJ Kilbane thought that limiting Throckmorton to "simple, unskilled work" adequately accounted for Dr. Bockner's opinions that Throckmorton had "moderate difficulties" with concentration, persistence, and pace overall and "moderate" limitations performing at a consistent pace and maintaining attention and concentration for extended periods in particular. R. 24–25; *see Davis v. Colvin*, No. 4:13cv35, 2014 WL 3890495, at *1, 12–13 (W.D. Va. Aug. 7, 2014) (reversing and remanding where the ALJ committed the same error). "In light of Dr. [Bockner's] *entire* opinion, the ALJ's error falls squarely in line with the Fourth Circuit's conclusion in *Mascio*: 'the ability to perform simple tasks differs from the ability to stay on task.'" *Bradley*, 2017 WL 4707035, at *3 (quoting *Mascio*, 780 F.3d at 638). The Commissioner should have an opportunity to correct that error on remand. *See id.* at *3–4.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Throckmorton's Motion for Summary Judgment, ECF No. 15, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 17, **REVERSE** the Commissioner's final decision, **REMAND** the case for further proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

## **Notice to Parties**

20

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and
Recommendation], any party may serve and file written objections to such
proposed findings and recommendations as provided by rules of court. A judge of
the court shall make a de novo determination of those portions of the report or
specified proposed findings or recommendations to which objection is made. A
judge of the court may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge. The judge may also receive
further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United

States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel

of record.

ENTER: January 2, 2018

Joel C. Hoppe
United States Magistrate Judge

21